UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JEAN KESKENY,

     *Plaintiff*,                          CASE NO. 16-cv-11362

*v.*                                   DISTRICT JUDGE THOMAS LUDINGTON
                                        MAGISTRATE JUDGE PATRICIA MORRIS

UNITED OF OMAHA LIFE
INSURANCE COMPANY

     *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON CROSS MOTIONS FOR JUDGMENT (Docs. 10, 11)**

**I.    RECOMMENDATION**

    For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiff's Motion

for Judgment, (Doc. 10), be **DENIED**, that Defendant's Cross-Motion for Judgment,

(Doc. 11), be **GRANTED**, and that Plaintiff's Complaint, (Doc. 1), be **DISMISSED**.

**II.    REPORT**

    **A.    Introduction**

    Plaintiff Jean Keskeny brings this action for long-term disability ("LTD") benefits

against Defendant United of Omaha Life Insurance Company under the civil enforcement

provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§

1132(a)(1)(B), 1132(a)(3). Both sides have moved for judgment on the record. (Dos. 10,

11). The parties have fully briefed their motions and the case is now ready for Report and

Recommendation, pursuant to E.D. Michigan Local Rule 7.1(f)(1). Because the evidence

fails to show Plaintiff was disabled under Defendant's Plan, I recommend DENYING her motion for judgment, (Doc. 10), and GRANTING Defendant's. (Doc. 11).

###### B.   ERISA

Concerned about the "growth in size, scope, and numbers of employee benefit plans," Congress passed ERISA in 1974 to ensure uniformity and stability in this rapidly changing field and to protect the interests of participants and beneficiaries of these plans. 29 U.S.C. § 1001; *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Among other things, ERISA regulates employee welfare benefit plans operated through insurance which provides payments in the event of disability. 29 U.S.C. § 1002(1); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir. 2009). Participants are employees or former employees who are or may become eligible to receive benefits under the plan. 29 U.S.C. § 1002(7). Beneficiaries, in turn, are persons "designated by a participant, or by the terms of an employee benefit plan, who [are] or may become entitled to a benefit thereunder." *Id.* § 1002(8).

At issue here is ERISA's civil enforcement provision allowing a plan beneficiary to bring an action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* § 1132(a)(1)(B). This "straightforward" provision lets beneficiaries bring suit for any benefits he believes have been wrongly withheld. *Davila*, 542 U.S. at 210. ERISA does not, however, establish whether a beneficiary is entitled to disability benefits—eligibility is determined by the Plan. *Cleveland v. Liberty Life Assur. Co. of Boston*, No. 06-137080, 2009 WL 649893, at *2 (E.D. Mich. Mar. 10, 2009) (adopting

Report & Recommendation). Nonetheless, claims for benefits must receive a "full and fair review" and participants are entitled to "specific reasons" for denial. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010).

### C.       Factual Background and Administrative Record

Plaintiff worked as a full-time Charge Nurse for MediLodge of Sterling ("MediLodge") from January 5, 2009, until February 4, 2013. (Doc. 1 at 2). MediLodge sponsored a Group Disability Plan ("the Plan") underwritten and administered by Defendant, which provided short- and long-term benefits to MediLodge employees. (*Id.*). As a MediLodge employee, Plaintiff was covered by the Plan. She ceased working allegedly "due to her ongoing progressively deteriorating condition manifesting the symptoms of Multiple Sclerosis [("MS")] along with other illnesses that are also disabling." (*Id.*). In August 2013, Plaintiff applied for and received short-term disability benefits under the Plan, but Defendant denied her LTD benefits claim on June 25, 2015. (Doc. 1 at 3). She appealed this denial, and Defendants denied her appeal. (*Id.*).

### 1.       The Plan

Under the Plan, an individual is disabled when "because of an Injury or Sickness, a significant change in [her] mental or physical functional capacity has occurred in which [she] is: (a) prevented from performing at least one of the Material Duties of [her] Regular Occupation on a part-time or full-time basis; and (b) unable to generate Current Earnings which exceed 99% of [her] Basic Monthly Earnings due to that same Injury or Sickness." (Doc. 9 at ID 68). "After a Monthly Benefit has been paid for 24 months,"

however, "Disability and Disabled mean [one is] unable to perform all of the Material Duties of any Gainful Occupation." (*Id.*).[1]

## 2.      Medical Evidence

### i.      Dr. Steven Beall

Dr. Beall was one of Plaintiff's treating physicians. The first session between Plaintiff and Dr. Beall documented in the record occurred on February 21, 2013, in which Plaintiff complained of persistent "buzzing in her head" associated "with pain in the left side of the neck and head which radiates to her shoulder," as well as "aching pain in the forearm with weakness and dropping things with the right upper extremity." (Doc. 9 at 183). Under "review of systems," Dr. Beall relayed that Plaintiff was "positive" she suffered from "depression, vertigo, asthma, COPD [chronic obstructive pulmonary disease]," and "fatigue." (*Id.*). After performing a physical examination and reviewing an MRI of Plaintiff's cervical spine, Dr. Beall supposed that Plaintiff had "myelopathic quadriparesis" and a "Kurtzke score[2] of 4, score of 4 in the visual axis, 3 in the pyramidal

---

[1] The Plan defines "Material Duties" as "the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified." (Doc. 9 at ID 69). The Plan further defines "Gainful Occupation" as "an occupation, for which You are reasonably fitted by training, education or experience, is or can be expected to provide You with Current Earnings at least equal to Your Gross Monthly Benefit within 12 months of Your return to work." (*Id.*).

[2] "The Kurtzke Disability Status Scale," ("Kurtzke scale"), "was developed by Dr. John Kurtzke in the 1950s to measure the disability status of people with multiple sclerosis," ("MS"). Marsha L. Tarver, *Kurtzke Expanded Disability Status Scale*, U.S. Department of Veterans Affairs, https://www.va.gov/MS/Professionals/diagnosis/Kurtzke_Expanded_Disability_Status_Scale.asp (last visited Feb. 16, 2017). It "provides a total score on a scale that ranges from 0 to 10. The first levels 1.0 to 4.5 refer to people with a high degree of ambulatory ability and the subsequent levels 5.0 to 9.5 refer to the loss of ambulatory ability. The range of main categories include (0) = *normal neurologic exam*; to (5) = *ambulatory without aid or rest for 200 meters*; *disability severe enough to impair full daily activities*; to (10) = *death due to MS*. In addition, it also provides eight subscale measurements called Functional System (FS) scores," namely: (1) Pyramidal (motor function); (2) Cerebellar; (3) Brainstem; (4) Sensory; (5) Bowel and Bladder; (6) Visual; (7) Cerebral or Mental; and (8) Other. *Id.* "People with [Kurtzke scores] of 4.0 and above have some degree of gait impairment. Scores between 4.0 and 9.5 are determined

axis, 2 in the cerebellar axis, 0 in the brainstem, sensory, bowel and bladder axis." (Doc. 9 at ID 185). He provided also that while "possible the weakness is due to the mild ventral impression . . . we will have to wait and see what the MRI of the brain shows." (*Id.*). Possible causes were "vascular, vasculitic, demyelinative, structural and metabolic." (*Id.*). In an appointment on March 5, 2013, Dr. Beall made similar neurological findings, with muscle weakness in her shoulder, elbow, digits, right hip flexor, and left ankle—he provided a "[c]urrent extended Kurtzke score [of] 3.5, score 3 on pyramidal axis, 2 on the cerebellar and visual axis, 0 on the brainstem, sensory, bowel and bladder axis." (Doc. 9 at 179). On March 27, 2013, Jay C. Jenkins, O.D.—Plaintiff's optometrist—penned a note to Dr. Beall regarding a Visual Evoked Potential ("VEP") test which produced results "very consistent with MS," although he acknowledged that any diagnosis would require further testing. (Doc. 9 at ID 1054). On April 2, 2013, Dr. Beall provided a Kurtzke score of 2 and himself noted the possibility that Plaintiff had MS. (Doc. 9 at 177).

Through May 2013, Dr. Beall continued to document similar observations and assigned Kurtzke scores of 2.5. (Doc. 9 at ID 166-71). On June 6, 2013, Dr. Beall examined an MRI of Plaintiff's brain, which showed three "periventricular lesions," and concluded that she "fulfill[ed] criteria for clinically definite multiple sclerosis" with a "current extended Kurtzke score of 2.5." (Doc. 9 at ID 162-64). Two other radiologists, who discussed the matter with Dr. Beall, reached the opposite conclusion. *See generally*

---

by both gait abilities and FS scores. . . . The [Kurtzke scale] is widely used and accepted as a valid tool to clinically measure and evaluate MS patients' level of functioning." *Id.*

(Doc. 9 at ID 368, 370) ("There is no evidence of multiple sclerosis."). Although Dr. Beall noted "tandem ataxia," this symptom waxed and waned in later examinations. *Compare* (Doc. 9 at ID 164), *with* (Doc. 9 at ID 158, 156) (showing no tandem ataxia in July 2013 and "some" tandem ataxia in December 2013). In July 2013, he assigned Plaintiff a Kurtzke score of 2 and observed that "[s]he is actually doing very well" despite some confusion as to her medication. (Doc. 9 at ID 158). Thereafter, in December 2013, he bumped her Kurtzke score to 2.5, noting that she was "stable" and that her muscle strength and tone was normal. (Doc. 9 at ID 156). Interestingly, he then described the MRI of Plaintiff's brain as showing *two* "tiny paraventricular lesions next to the frontal horns, unchanged from [the] previous scan." (*Id.*).

Nearly a year later, Dr. Beall ordered an MRI of Plaintiff's cervical spine, which revealed "[m]inimal anterolisthesis . . . from extensive degenerative changes" at certain areas of her spine. (Doc. 9 at ID 718). In December 2014, Dr. Beal assigned a Kurtzke score of 3 and relayed Plaintiff's complaints of "weakness" and "pain in her back, neck and arms occurring every day and lasting all day at a three out of five severity." (Doc. 9 at ID 154). He scheduled a follow-up appointment for a month later. (*Id.*). The following year in June 2015, he noted similar complaints, though now the pain increased in severity such that "by the end of the day she [could] hardly walk." (Doc. 9 at ID 150). "Additionally," he opined, "when you fatigue the knee flexor by repetitive testing, which is initially normal, after seven repetitions of fatiguing she is now moderately weak with the usual form of testing," which "demonstrates she is fatig[a]ble" in about "18 different muscles throughout her body." (*Id.*).  As a result of these impairments, "she is severely

disabled at the end of the day." (*Id.*). In this session, he assessed a Kurtzke score of 6.5. He also relayed his impression that for "the past six months she has steadily gone downhill," and that due to her "existing history of hepatitis," she could not tolerate "the high dose interferons which could reverse her disease or make it less worse." (*Id.*). "I expect that there would be no way that she could stand up and walk during the eight hour work day, and there is sufficient evidence . . . that she would not be able to sit up for this duration either." (*Id.*).

In a June 2, 2015 correspondence to Dr. Beall, Kirsten Lyons—who worked in Defendant's employ—requested "further clarification" as to Plaintiff's medical condition. (Doc. 9 at 144-48). Dr. Beall reacted to its contents in the margins. Where the letter suggested that Plaintiff's file did not "indicate any specific comprehensive evaluations or treatment for multiple sclerosis beyond July, 2013," Dr. Beall wrote "[t]his is wrong," citing examinations from December 19, 2013, December 12, 2014, and January 22, 2015. (Doc. 9 at ID 144). In response to Lyons's assertions that "given [Plaintiff's] neck and low back pain and imaging evidence of degenerative disc disease, [Plaintiff] would have difficulty lifting, pushing, pulling, and carrying greater than 20 pounds," as well as repetitively twisting and crouching, but "[t]here were no current gait abnormalities noted to preclude standing and walking up to six hours in an eight hour workday with the ability to change position as needed for comfort," and "[t]here was also no evidence that she would not be able to sit up to six hours in an eight hour workday with the ability to change positions as needed for comfort," Dr. Beall replied: "No. Patient cannot do this. Today's exam shows she is weaker than a 4 [year] old girl." (Doc. 9 at 146). The letter

asked Dr. Beall to "acknowledge" agreement "by signing in the space provided at the bottom of [the] letter," to which Dr. Beall replied "I do not agree with you," explicitly refusing to sign the letter. (*Id.*).

### ii.       Dr. Mohamed Abuharaz

Dr. Abuharaz's treating relationship with Plaintiff extended back to November 2014. In January 2015, he noted that Plaintiff had an abnormal gait. (Doc. 9 at ID 627). A March 11, 2015 x-ray ordered by Dr. Abuharaz of Plaintiff's right shoulder showed a "[l]imited range of motion" and "minimal rotator cuff tendonitis," though "[n]o bone pathology" was detected. (Doc. 9 at ID 444). He later referred Plaintiff to Dr. Ofori-Darko for further consultation. On March 26, 2015, Plaintiff was seen "with rather non-specific symptoms," complaining of dyspnea with exercise, fatigue, sweats, weight gain, difficulty swallowing, hair loss, heat intolerance, heartburn, easy bruising, allergies, itching, back pain, muscle weakness, memory loss, asthma, cough, shortness of breath with exercise, and wheezing. (Doc. 9 at 620-21). Dr. Ofori-Darko relayed an impression of chronic Hepatitis C, obesity, and nonulcer dyspepsia. (Doc. 9 at 622).

A May 6, 2015 ultrasound performed on Dr. Abuharaz's request disclosed "somewhat incongruent" findings with, among other things, "severely abnormal" waveforms bilaterally, suggesting the "presence of significant aortoiliao inflow disease." (Doc. 9 at ID 442). A subsequent CT scan of Plaintiff's abdomen, pelvis, and lower extremities revealed a "[m]oderate amount of calcific plaque involving the aortoiliac vessels with patent bilateral common iliac stents" in addition to "an element of endothelial proliferation in the mid right common iliac stent." (Doc. 9 at ID 440). In a

June 29, 2015 statement, he verified that Plaintiff "has multiple problems including COPD, Hep[atitis] C, [c]hronic neck pain, and severe PAD [peripheral artery disease]," and indicated that they were "chronic and irreversible." (Doc. 9 at ID 374). "In my opinion, [Plaintiff] will never be able to be gainfully employed again." (*Id.*).

In September 2015, Dr. Abuharaz performed a largely normal examination on Plaintiff. (Doc. 9 at ID 384). And in an October 15, 2015 examination, he assessed a Kurtzke score of 6.5 while noting various muscle weaknesses, but he also found normal gait and ambulation, and he did not identify the need for a cane, walker, wheelchair, or other bilateral support. (Doc. 9 at ID 191, 251). On November 19, 2015, Dr. Abuharaz assessed a Kurtzke score of 2.5, and nearly a month later bumped this score to 3. (Doc. 9 at ID 187, 255).

### iii.    N.P. Beth Weaver

The medical evidence of record suggests that Nurse Practitioner Beth Weaver's treating relationship with Plaintiff extended back to 2013. In October 2014, N.P. Weaver ordered an MRI of Plaintiff's lumbar spine, which showed "[s]mall broad-based protrusions at L3-L4 and L4-L5 with mild spinal canal narrowing at L3-L4," as well as "mild bilateral neural foraminal narrowing at L3-L4 and L4-L5." (Doc. 9 at ID 718). On November 24, 2014, N.P. Weaver documented Plaintiff's complaints of "gait abnormality," "stiffness," "back pain," and "neck pain." (Doc. 9 at ID 457). Plaintiff had also complained of "fatigue and weakness." (*Id.*). A physical examination revealed "decreased flexion" and "extension" in the cervical spine, as well as "decreased flexion" around the ribs and pelvis. (Doc. 9 at ID 459). The diagnoses that followed included

unspecified essential hypertension, cervical radiculopathy, low back pain, and a cough. (*Id.*). The symptoms reported in these notes mirrored those in notes from October 30, 2014, which included a diagnosis of multiple sclerosis. (Doc. 9 at ID 465).

### 3.   Administrative Proceedings

In March 2013, R.N. Sara Schmit performed a medical file review of Plaintiff's claim for LTD benefits on behalf of Defendant. After reviewing the evidence, she concluded that Plaintiff's complaints, "diagnostic findings and restrictions and limitations are inconsistent with Dr. Beall's physical findings." (Doc. 9 at 917). She continued:

> The claimant's complaints are of right shoulder and forearm pain, but restrictions note she is capable of continually reaching and finger dexterity. The claimant has ataxia, but according to Dr. Beall can stand and or walk for 4 hours at one time. The claimant reports symptoms that began 7 months prior to February visit (approximately July-August) and documentation reveals no evidence of a significant change in the claimant's condition as of last date worked and there is insufficient evidence of impairment in relationship to her pain complaints. Available documentation does not provide a description of impairment that would preclude the claimant from performing her job duties.

(*Id.*). She updated this assessment on April 8, 2013, upon receipt of new information. In her update, she found, among other things, that neurological testing "showed no signs of multiple sclerosis," but "[t]he claimant has moderate shoulder abductor, elbow extensor, finger abductor and extensor digitrum extensor lucis longus weakness bilaterally which would impact and impair her ability to lift and carry." (Doc. 9 at 921). She noted further that "Dr. Beall wishes to go over MRI results with another neurologist with experience in multiple sclerosis to determine if indeed the MRI is negative for MS," partly because the

VEP performed by Dr. Jenkins "notes that the results were consistent with [MS]." (*Id.*).[3]

Ultimately, she concluded that "[b]ased on the medical evidence presented in this case, it

is my opinion that the claimant would be unable to lift and carry up to 50 pounds and

stand and or walk for 6 hours in an 8-hour day from 2/1/13 through 5/19/13." (*Id.*).

 In April 2015, later in the appeals process, claim reviewer Denise Theisen

reviewed the medical record and determined that it contained a "history of multiple

complaints without significant obvious ongoing impairment confirmed." (Doc. 9 at ID

937). Further:

> No evidence in file that claimant is unaccompanied to exams, requires a
> driver or any assistance with gait or getting on and off exam tables.
> Claimant reports needing help with ADL's [activities of daily living],
> shopping, household chores, etc. No exam evident physical functional
> decline consistent with these claims. . . . No current gait abnormalities noted
> to preclude standing and walking up to 6 hours in an 8 hour workday with
> ability to changes position as needed for comfort. No evidence in file that
> claimant would not be able to sit up to 6 hours in an 8 hour workday with
> ability to changes positions as needed for comfort. Claimant appears to have
> work capacity with above restrictions considered.

(*Id.*).

 On May 30, 2015, Lyons referred Plaintiff's claim to Douglas Palmer, a

Vocational Rehabilitation Consultant, to "evaluate [her] transferable skills to determine if

she would qualify for employment in occupations comparable with her supported level of

activity, restrictions and limitations" as well as whether such occupations exist in her

local area and pay a gainful wage. (Doc. 9 at ID 595). The report emerged on June 1,

2015. (Doc. 9 at ID 595-98). He found that her work experience in nursing and personal

---

[3] As discussed above, these other radiologists did not find that the MRI evidenced MS. (Doc. 9 at 368, 370).

attendant services suggested transferable skills such as "apply[ing] technical knowledge, common sense, and special medical skills to car[e] for or treat sick or handicapped people," as well as "adapt[ing] to emergency situations," "instruct[ing], plan[ning] or direct[ing] the work of others," "keep[ing] accurate records," follow[ing] specific instructions," and "get[ting] along with different types of people." (Doc. 9 at ID 596). Thereafter, Palmer decided that opportunities to work as a manicurist, phlebotomist, hospital-admitting clerk, and appointment clerk existed in the Northeast Lower Peninsula of Michigan, which he characterized as "a viable commutable labor market . . . ." (Doc. 9 at 595-96).

On June 25, 2015, Plaintiff received a letter from Defendant denying her claim for LTD benefits beyond August 11, 2015. (Doc. 9 at 512-20). Among other things, it found that her file "does not indicate any specific comprehensive evaluations or treatment for multiple sclerosis beyond July, 2013. . . . There was no evidence that you have been referred to physical therapy or pain management for any interventional steroid injections. . . . [And] examinations did not show any significant strength, sensation, motion or coordination abnormalities." (Doc. 9 at 516). The letter also denied receiving "any evidence that you were unaccompanied to your examinations, that you required a driver or any assistance with your gait or getting on and off the examination tables. You reported needing help with your activities of daily living, shopping, and household chores; however, the examinations were not consistent with these claims." (Doc. 9 at 516-17). These findings led Defendant to the conclusion that Plaintiff "would be capable of performing sedentary and light occupations as defined by the Department of Labor's

definition of work, on a full-time basis," including jobs like manicurist, phlebotomist, hospital-admitting clerk, and appointment clerk. (Doc. 9 at ID 517-18). Because Defendant was "able to identify and . . . document[] [its] findings of Gainful Occupations with physical strength demands of sedentary and light," and because such occupations "also meet the necessary gainful wage, 60% of [Plaintiff's] pre-disability wages, and exist in [her] local economy," Defendant concluded that "no further benefits are payable beyond August 11, 2015" and denied Plaintiff's claim for ongoing benefits. (Doc. 9 at 518).

Plaintiff appealed this denial. In January 2016, Defendant arranged for a medical record review by neurologist Robert L. Marks, M.D. On February 8, 2016, after reviewing the above-described evidence, he penned his report. In it, he balanced various sources of evidence. For instance, although "evidence of tandem ataxia is mentioned," Plaintiff's gait was "not specifically described," and "[t]here was no Romberg sign" aside from a record from June 12, 2015; he reasoned that "non-tandem walking was without significant deviation, because it most likely would have been described." (Doc. 9 at ID 104-05). He concluded by suggesting that the accuracy of an MS diagnosis remained uncertain. (Doc. 9 at 105).

Reporting on restrictions affecting Plaintiff supported by the records before him, Dr. Marks claimed he "could not find substantiation that [Plaintiff] was unable to arise from a chair to stand and walk, although an assistive device may be necessary." (Doc. 9 at 106). In addition:

Activities should be mostly seated (up to 5.5 hours per 8 hour activity day), but with occasional standing and walking (up to 2.5 hours per 8 hour activity day, but only 15 minutes at one time); brief change of posture/position should be permitted as necessary, and the claimang should not be precluded from taking brief pauses to avoid excessive fatigue; the claimant should avoid improper bending forward; some stooping (with bending of the knees should be possible), but kneeling, crawling and climbing should be avoided; brisk extreme neck movements should be avoided; reaching at waist or below should be possible on a frequent basis; reaching over shoulder level should be possible on a frequent basis. Lifting of up to 10 pounds should be possible on an occasional basis (not repetitively). Pushing and pulling should be restricted to 20 pounds (if claimant uses a wheeled cart). The claimant should avoid activities in uncomfortably warm environments, and restroom facilities should be in reasonable proximity. The dates for the preceding restriction recommendations apply to 08/12/2016 (believe this is a typo and should read 8/12/15) through 01/21/2016 onward, but may need adjustments or modifications in the future depending on the stability of the claimant's condition.

(*Id.*).

Dr. Marks proceeded to discredit each of Plaintiff's medical source opinions. Summarizing these opinions, he recounted: Dr. Abuharaz suggested that Plaintiff would "never be gainfully employed again"; N.P. Weaver assessed restrictions on sitting, standing, and walking for less than an hour each in an eight-hour workday and advised against lifting, carrying, and using hands or feet repetitively; and Dr. Beall found Plaintiff "weaker than a four year old girl in eleven different muscles," assessed a Kurtzke score of 6.5, noted worsening vision, and documented how repetitious movement caused "extreme fatigue." (Doc. 9 at ID 107). To these opinions, Dr. Marks cautioned against "relying too much on purely subjective symptoms." (*Id.*). He further opined that the "records do not substantiate" an inability "to move about" nor to use "the upper extremities," and that as a result, the "limitations provided by the attending physicians are

somewhat excessive." (*Id.*).  "Although it is possible that demyelinating disease such as MS is a correct diagnosis, it cannot be considered an absolutely definitive diagnosis at this time. Time will eventually provide verification." (*Id.*).

### D.       Standard of Review

In the Sixth Circuit, courts do not strictly follow the Rule 56 summary judgment standard when reviewing an ERISA benefit determination. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Instead of rendering a threshold decision on whether material factual disputes exist, courts conducting *de novo* review are to examine the administrative record and make "findings of fact and conclusions of law accordingly," taking into consideration arguments about the "proper analysis of the evidentiary materials contained in the administrative record" but not admitting or considering any extraneous evidence. *Id.* Only if the plaintiff issues a procedural challenge to the administrator's decision, such as lack of due process or bias, can the court consider materials outside the record. *Id.* An accusation that the administrator had a conflict of interest, for example, could open the door to such evidence. *See, e.g.*, *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 n.2 (6th Cir. 2005) (noting that the parties could have explored the alleged conflict of interest through discovery).

ERISA does not provide an explicit standard for reviewing benefit eligibility challenges. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989). The default standard is therefore *de novo* review of the administrator's or fiduciary's decision, *id.* at 115; *Ross*, 558 F.3d at 608, applying to both the factual findings and legal conclusions. *Wilkins*, 150 F.3d at 613. Under this standard, a court does not give

"deference to the decision" or presume its correctness, but instead asks whether it is correct. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). Put differently, the court "'simply decides whether or not it agrees with the decision under review.'" *Miller v. Hartford Life Ins. Co.*, 348 F. Supp. 2d 815, 817 (E.D. Mich. 2004) (quoting *Anderson v. Great W. Life Assurance*, 777 F. Supp. 1374, 1376 (E.D. Mich. 1991)). Accordingly, courts have looked to see whether the preponderance of the record evidence supports disability. *James v. Liberty Life Assurance Co. of Boston*, 984 F. Supp. 2d 730, 736 (W.D. Mich. 2013) (*James I*) *aff'd by* 582 F. App'x 581 (6th Cir. 2014) (*James II*) (agreeing that preponderance of the evidence supported finding disability).

Where the plan gives the fiduciary or administrator discretion to determine eligibility, the arbitrary and capricious standard is used on review. *Bruch*, 489 U.S. at 103; *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). This standard applies when the policy expressly "grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). Nonetheless, the plan may give such authority without the use of any "'magic word,'" like "discretionary." *Renfro v. UNUM Life Ins. Co. of America*, 920 F. Supp. 831, 837 (E.D. Tenn. 1996) (quoting *Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1453 (D.C. Cir. 1992) (per Ruth Bader Ginsburg, J.)). If the decision is reviewed under this standard, the court will uphold it as long it resulted from "'a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Whitaker*, 404 F.3d at 949 (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

In Michigan, however, the regulatory body overseeing insurance policies, the Michigan Office of Financial and Insurance Services ("OFIS"), has prohibited policies enacted or revised after July 1, 2007 from granting discretionary authority which would trigger the arbitrary and capricious review standard. Mich. Admin. Code R. 500.2201-02 (2015). *See also Ross*, 558 F.3d at 602-03; *Rice-Peterson v. UNUM Life Ins. Co. of America*, No. 11-14565, 2013 WL 1250457, at *7-8 (E.D. Mich. Mar. 26, 2013). According to the regulations

> (b) On and after [July 1, 2007] . . . an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.

> (c) On and after [July 1, 2007] . . . a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code R. 500.2202(b)-(c). A discretionary clause "purports to bind the claimant to or grant deference in subsequent proceedings to the insurer's decision, denial, or interpretation" of the policy. *Id.* R. 500.2201(c). A clause meets this definition by giving rise to a standard of review on appeal other than *de novo* review. *Id.* R. 500.2201(c)(vii). The Sixth Circuit has found that ERISA, which explicitly supersedes state laws on employee benefit plans, 29 U.S.C. § 1144(a), does not preempt these regulations. *Ross*, 558 F.3d at 609. As a result of these regulations, "any ERISA plans

issued or amended after July 1, 2007 requires '*de novo* review of denials of ERISA benefits within Michigan.'" *Rice-Peterson*, 2013 WL 1250457, at *8 (quoting *Gray v. Mut. Of Omaha Life Ins. Co.*, No. 11-15016, 2012 WL 2995469, at *3 (E.D. Mich. July 23, 2012)). This is true even if the plan contains discretionary language, since such provisions are void. *Id.*; *see also Keane v. Lincoln Nat'l Life Ins. Co.*, No. 1:11-CV-656, 2012 WL 4127827, at *5 (W.D. Mich. Sept. 18, 2012) ("Although the Policy contains language granting Lincoln National discretionary authority to construe the Policy's terms and to determine eligibility, . . . the parties acknowledge that the proper standard of review in this case is *de novo*, in light of Michigan Administrative Code Rule 500.2202(b) . . . .").

The parties here agree that the *de novo* standard applies. (Doc. 10 at 9); (Doc. 11 at 17). I agree: ERISA governs the Plan, its effective date was after July 1, 2007, (Doc. 9 at ID 27), and Plaintiff resided in Michigan during the relevant period, (Doc. 1 at 1-2).

### E.      Analysis

"To succeed in [her] claim for disability benefits under ERISA, Plaintiff must prove by a preponderance of the evidence that [she] was 'disabled,' as that term is defined in the Plan." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700 (6th Cir. 2014). Gesturing towards an alleged failure to credit laudable evidence from Plaintiff's treating physicians, as well as Defendant's exclusive reliance on (non-examining) medical record reviews, Plaintiff contends that Defendant's claim review was flawed and ought to be reversed. In considering Plaintiff's claim, I will in turn weigh these discrete assertions.

As Plaintiff notes, "[p]lan administrators are not obliged to accord special deference to the opinions of treating physicians," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003), but they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015). In *Nord*, the Supreme Court declined to apply the treating physician rule from the Social Security disability program to ERISA cases. That rule requires the Administration to "give more weight to opinions from . . . treating source" or provide "good reasons" for not doing so. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Court held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Nord*, 538 U.S. at 834. In coming to this conclusion, the Court observed that while a treating physician may be more familiar with the patient's condition, granting them deference "may make scant sense" in a variety of circumstances, such as when the relationship was relatively brief or the physician is contradicted by a specialist consultant with greater expertise. *Id.* at 832. Thus, courts will not accord a treating physician's opinion greater weight without reason. *See Calvert*, 409 F.3d at 293.

Defendant properly considered evidence from Plaintiff's treating physicians and reached a conclusion contrary to theirs, but nevertheless sound. Dr. Beall's opinion presents the most significant evidence for Plaintiff's disability claim, in that he suggests that she suffers from incredible muscle weakness and severe gait impairments. But not

once does he document a need for bilateral assistance, such as a cane or a walker, which one would expect of an individual with a Kurtzke score of 6.5, and with a score of 4 on the pyramidal and visual axes.[4] Though he confidently diagnoses MS from his reading of an MRI, two other radiologists more familiar with MS found that the MRI either did not furnish such evidence or proved inconclusive on the matter. (Doc. 9 at 368, 370).

The opinions most consistent with Dr. Beall's flow from Dr. Abuharaz, who assessed similarly high Kurtzke scores, also documented normal gait and ambulation rather than impaired movement requiring bilateral support. (Doc. 9 at ID 191, 251). A month after he made this assessment, Plaintiff's Kurtzke scores dipped to 2.5 and 3, though Dr. Abuharaz's physical exams seem no different on paper than the one prompting Plaintiff's higher score. *Compare* (Doc. 9 at ID 187, 255), *with* (Doc. 9 at ID 191, 251), *and* (Doc. 9 at ID 384). Moreover, Dr. Abuharaz declined to mention MS as one of Plaintiff's conditions in his medical source statement, which essentially contains but a conclusory assertion that Plaintiff "will never be able to be gainfully employed again." (Doc. 9 at ID 374). These inconsistencies and conclusory statements detract from Drs. Abuharaz's and Beall's opinions, at least as to their more severe reflections.

To this, however, Plaintiff might posit that the presence of uncertainty should have prompted Defendant to personally examine her, rather than coast on medical record reviews. Indeed, Plaintiff asks this Court to find the Defendant's failure to order an

---

[4] The Kurtzke score of 6.5 describes a person requiring "[c]onstant bilateral assistance (canes, crutches, braces) . . . to walk about 20 meters without resting; (Usual FS equivalents are combinations with more than two FS grade 3+)." National Multiple Sclerosis Society, *Kurtzke Expanded Disability Status Scale (EDSS)*, https://www.nationalmssociety.org/NationalMSSociety/media/MSNationalFiles/Brochures/10-2-3-29-EDSS_Form.pdf (last visited February 17, 2017).

independent medical examination of Plaintiff—and its reliance exclusively on medical record reviews—are toxic to its defense. (Doc. 10 at 12) ("The failure of Dr. Marks to personally examine [Plaintiff] and/or the refusal of the Defendant to insist on a personal examination . . . is the quintessential failure demonstrating an erroneous interpretation of the record, and/or arbitrary and capricious conduct on the Defendant's part.").

There is, however, "nothing inherently objectionable about a file review . . . in the context of a benefits determination" unless it proves "clearly inadequate." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Such inadequacy commonly arises, for instance, where the file reviewer "second-guesse[s]" the objective evidence on file—*Koning v. United of Omaha Life Ins. Co.*, 627 F. App'x 425, 437 (6th Cir. 2015)—discounts opinions relating to "mental and emotional stability"—*Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008)—makes "credibility" determinations from afar—*Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 394 (6th Cir. 2009)—or where "only [the administrator's] physicians, who had not examined [the claimant], disagreed with the treating physicians." *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002).

The file reviews at issue, though not flawless, feature none of these pitfalls. Dr. Marks, for instance, simply draws the same conclusion I do in noting that Plaintiffs records "do not substantiate" an inability "to move about." (Doc. 9 at ID 107). And Defendant's reviewing physicians were not alone in questioning the certainty of Dr. Beall's diagnosis, unlike the reviewers in *Hoover*. *Compare* 290 F.3d at 809, *with* (Doc. 9 at ID 162-64), *and* (Doc. 9 at ID 368, 370). More importantly, Defendant's reviewers did

not ignore Plaintiff's medical evidence, as they noted reliable evidence showing an impaired ability to lift and carry, as well as move about. (Doc. 9 at ID 106, 917, 937). Their assessment remains consistent in many respects with, for instance, Dr. Weaver's most credible observations. *E.g.*, (Doc. 9 at 459, 465). Although Dr. Marks's suggestion that Plaintiff's physicians relied too heavily on her subjective assertions could be construed as a jab at Plaintiff's credibility, it behaves more like a lament about the dearth of objective evidence on record. Time and again, this Circuit has held that "it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity." *Rose v. Hartford Financial Services Group, Inc.*, 268 F. App'x 444, 453 (6th Cir. 2008). Such evidence is lacking. Therefore, I suggest that Plaintiff has failed to prove by a preponderance of the evidence that she is entitled to the benefits claimed.

### F.   Conclusion

For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiff's Motion for Judgment, (Doc. 10), be **DENIED**, that Defendant's Cross-Motion for Judgment, (Doc. 11), be **GRANTED**, and that Plaintiff's Complaint, (Doc. 1), be **DISMISSED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S.

140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  February 24, 2017                     S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: February 24, 2017                      By s/Kristen Castaneda
                                             Case Manager

23